### UNITED STATES  DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**FELTON LAGARDE**                                      **CIVIL ACTION**

**versus**                                                          **NO. 10-1679**

**N. BURL CAIN, WARDEN**                          **SECTION: "N" (1)**

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Felton Lagarde, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On January 18, 2007, he was convicted of second degree murder in violation of Louisiana law.[1]  On February 9, 2007, he was sentenced to a term of life

---

[1]  State Rec., Vol. II of VII, transcript of January 18, 2007, p. 48; State Rec., Vol. II of VII, minute entry dated January 18, 2007.

The Court notes that petitioner was also convicted of armed robbery in a separate proceeding. However, that conviction is not challenged herein, in that petitioner's claims relate only to the

imprisonment without benefit of parole, probation, or suspension of sentence.[2]  The Louisiana Fifth Circuit Court of Appeal affirmed his conviction and sentence on October 30, 2007.[3]  The Louisiana Supreme Court then denied his related writ application on May 16, 2008.[4]

On or about August 27, 2008, petitioner filed with the state district court an application for post-conviction relief.[5]  That application was denied on November 20, 2008.[6]  His related writ applications were likewise denied by the Louisiana Fifth Circuit Court of Appeal on April 29, 2009,[7] and by the Louisiana Supreme Court on March 12, 2010.[8]

On May 2, 2010, petitioner filed the instant federal application for *habeas corpus* relief.[9]  In support of his application, he asserts the following claims:

---

second degree murder conviction.

[2]  State Rec., Vol. II of VII, transcript of February 9, 2007; State Rec., Vol. II of VII, minute entry dated February 9, 2007.

[3]  State v. LaGarde, 970 So.2d 1111 (La. App. 5th Cir. 2007) (No. 07-KA-288); State Rec., Vol. VI of VII.

[4]  State v. Lagarde, 980 So.2d 706 (La. 2008) (No. 2007-KO-2412); State Rec., Vol. V of VII.

[5]  State Rec., Vol. VI of VII.

[6]  State Rec., Vol. IV of VII, Order dated November 20, 2008.

[7]  State v. Lagarde, No. 09-KH-221 (La. App. 5th Cir. Apr. 29, 2009) (unpublished); State Rec., Vol. VII of VII.

[8]  State ex rel. Lagarde v. State, 28 So.3d 1022 (La. 2010) (No. 2009-KH-1199); State Rec., Vol. VII of VII.  On April 16, 2010, the court also denied petitioner's application for rehearing.  State ex rel. Lagarde v. State, 31 So.3d 1057 (La. 2010) (No. 2009-KH-1199); State Rec., Vol. VII of VII.

[9]  Rec. Doc. 3.

1.      Petitioner's rights were violated when he was allowed to
        represent himself at a suppression hearing;

2.      Petitioner's rights were violated by the admission of evidence
        concerning another crime; and

3.      Petitioner's rights were violated by the trial court's denial of
        his oral motion for a continuance.

The state concedes that petitioner's application was timely filed.[10]

### I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of law, questions of fact, and mixed questions of law and fact.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and pure questions of fact are reviewed under § 2254(d)(2).   Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of,

_____

[10]  Rec. Doc. 14, p. 7.

clearly established Federal law, as determined by the Supreme Court of the United States."  28

U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses

[of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals

has explained:

> A state court decision is contrary to clearly established precedent if
> the state court applies a rule that contradicts the governing law set
> forth in the [United States] Supreme Court's cases.  A state-court
> decision will also be contrary to clearly established precedent if the
> state court confronts a set of facts that are materially
> indistinguishable from a decision of the [United States] Supreme
> Court and nevertheless arrives at a result different from [United
> States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets,

and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court

has explained:

> [A] state-court decision can involve an "unreasonable application" of
> this Court's clearly established precedent in two ways.  First, a
> state-court decision involves an unreasonable application of this
> Court's precedent if the state court identifies the correct governing
> legal rule from this Courts cases but unreasonably applies it to the
> facts of the particular state prisoner's case.  Second, a state-court
> decision also involves an unreasonable application of this Court's
> precedent if the state court either unreasonably extends a legal
> principle from our precedent to a new context where it should not
> apply or unreasonably refuses to extend that principle to a new
> context where it should apply.

Williams v. Taylor, 529 U.S. 362, 407 (2000).  The Supreme Court has noted that the focus of this

inquiry "is on whether the state court's application of clearly established federal law is objectively

unreasonable, and we stressed in <u>Williams</u> that an unreasonable application is different from an incorrect one."   <u>Bell</u>, 535 U.S. at 694.

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(2); <u>see also</u> 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.   The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

## II.  Facts

On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts of this case as follows:

> Robert McCrory testified at trial that, on August 3, 2004, at approximately 5:30 to 5:45 p.m., he was about to watch the evening news at home when he heard two gunshots.   When he got up out of his chair and looked out of the blinds, he observed defendant standing at the back of the lot directly across the street with a gun in his hand shooting at the ground.   McCrory could not see what defendant was shooting at because the weeds were too high.   As he looked out the window, McCrory saw defendant shoot one or two more times, then defendant turned around to see if anybody was looking.   McCrory explained that defendant subsequently reached into his pocket, pulled out a black mask, put it over his head, and ran away.   After the incident, McCrory went outside and saw a man lying on the ground. He positively identified defendant in a photographic lineup and in court as the shooter.   McCrory noted that, immediately before he went inside his house to watch the evening news, he noticed defendant and another "guy" headed toward the back of the lot.

Dr. Frasier MacKenzie, an employee of the Jefferson Parish coroner's office and a stipulated expert in the field of forensic pathology, testified that he performed the autopsy on the victim, Brian Scott, and found five gunshot wounds to the body, three of which were fatal (those to the head, right shoulder, and left shoulder).

Detective Dax Russo of the Jefferson Parish Sheriff's Office (JPSO) testified that, on or about August 4, 2004, he was assigned to investigate a claim regarding a stolen 1995 Toyota 4-Runner vehicle. When he searched that vehicle, he recovered a .25 caliber Raven semi-automatic silver handgun from under the front passenger seat.

Louise Walzer, a stipulated expert in the field of firearms identification, testified that the .25 caliber bullet recovered from the victim's back was fired from the weapon recovered from the stolen Toyota 4-Runner.

JPSO Sergeant Larry Dyess testified that, on August 4, 2004, at 2:29 p.m., defendant waived his rights and gave a statement. The statement indicated that defendant was advised he was under arrest for second degree murder and under investigation for armed robbery.

In his statement, defendant said that he and a white female were smoking crack cocaine in a crack house. He then asked the female to give him a ride, but she refused. Defendant explained that the female got into her vehicle and started it, and that he got in the back seat, put the vehicle in park, and grabbed the keys. A struggle ensued, and the female subsequently jumped out of the vehicle. Defendant then jumped in the front seat and pulled off. Defendant said that he had a .380 automatic weapon in his pocket but did not point it at her.

After defendant left, he went across the river and parked the vehicle somewhere downtown. Defendant told the detective that the keys to the vehicle were "in his property." He admitted that he was looking for a ride away from the area because someone told him that he had killed "Egghead."[FN3] Defendant explained that he and "Egghead" had gotten into an argument about $500.00 that "Egghead" owed him. He indicated that this argument occurred on Heather by Wayne (Streets) at a stop sign. "Egghead" said something to defendant that made him angry, but he could not remember what it was, so he shot the (.380) gun one time into the ground.

> [FN3]   Sgt. Dyess testified that "Egg" was the nickname of the victim, Brian Scott.

Defendant stated that that was not the same gun he used in the "other incident" that he and the detective previously talked about. He said that he left that weapon, which was silver, "way down somewhere." Defendant stated that his partner nicknamed "Lester" or "June" came up to him after he shot the gun and gave him some crack cocaine. Defendant then left and went to "get loaded." The next thing defendant remembered was coming out of "the house" from "getting loaded" and walking up the street. Defendant stated that "Lester" or "June" then told him that people were looking for him because they said defendant had killed "Egghead."

Defendant said that he did not remember whether he killed "Egghead." He indicated that he left the clothes he was wearing when he got into the argument with "Egghead" (black pants and a gray shirt) at his home in the Magnolia projects. He said that he was also wearing a gray "do-rag" on his head, which he always wore. Defendant explained that a "do-rag" was worn by either women or gang members, and that he would fit into the gang member category.

Sgt. Dyess identified photographs of keys to the Toyota 4-Runner taken from "the property belonging to defendant."

After the State rested, defendant testified that he knew the victim, Brian Scott, as they grew up together and were best friends. He explained that Scott was also known as "Egg." Defendant remembered having an argument with Scott regarding money on the day in question. He testified that after he shot the gun into the ground, he went to the crack house, and Scott went somewhere else. Defendant said that Scott died approximately 30 to 40 minutes later. He initially testified that he did not shoot Scott, but he later admitted that he did not know whether he shot Scott.

Defendant also admitted that he was addicted to crack cocaine and heroin. He testified that he did not have crack cocaine prior to the argument with Scott. Defendant indicated that he did not remember giving a statement because he was high on crack cocaine, heroin, and ecstasy at the time. Defendant also testified that after "Lester" told him that people were saying he had killed "Egg," defendant stole a woman's vehicle and left.[11]

---

[11] State v. LaGarde, 970 So.2d 1111, 1115-17 (La. App. 5th Cir. 2007) (No. 07-KA-288); State Rec., Vol. VI of VII.

III.  Petitioner's Claims

A.  Self-Representation

Petitioner's first claim is his rights were violated when he was allowed to represent himself at a suppression hearing.[12]  On direct appeal, the Louisiana Fifth Circuit Court of Appeal rejected that claim, holding:

> [D]efendant argues that the trial court erred by allowing him to represent himself at the suppression hearing without first securing a valid waiver of his right to counsel.  He contends that the trial court failed to advise him of the dangers and pitfalls inherent in self-representation, and that the trial court made no effort to ascertain whether he understood his actions.  Therefore, defendant asserts that his waiver of his right to counsel was not knowingly and intelligently made.
>
> The State responds that a "Faretta[FN4] hearing" is not required in pre-trial proceedings but only requires a waiver of counsel at trial.  The State further responds that defendant is precluded from claiming he had inadequate representation during the suppression hearing because he acquiesced in the decision to represent himself at that hearing.  The State also contends that defendant cannot show prejudice as a result of representing himself at the suppression hearing.
>
> [FN4] Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
>
> The record shows that, on January 17, 2007, the first day of trial, defendant advised the trial judge that he wanted new representation.  The trial judge responded that defendant had to remain with John Benz, his Indigent Defender Board (IDB) attorney, whether he liked him or not.  Defendant explained that his attorney had no defense for him other than to show evidence of his drug addiction.  The trial judge countered that defendant's attorney could

---

[12]  Although petitioner originally indicated that he wanted to represent himself throughout the trial, he changed his mind after the suppression hearing.  He was therefore represented by counsel during the actual trial.  See State Rec., Vol. II of VII, transcript of January 17, 2007, p. 53.

not fabricate a defense, and that defendant had to provide one himself. Defendant said he tried to do that, but his attorney would not listen to him. He also added that he had just been convicted on his first violent offense with his IDB attorney and received a 99-year sentence.

The trial judge stated that just because defendant did not get the result he wanted did not mean his attorney was not doing his best. Defendant said all he had on his case were police reports and statements, and the trial judge responded that that was probably all that had been provided to his attorney. Defendant indicated that his attorney had filed no motions for discovery. He further stated that he had told his attorney he had been in mental hospitals, was on medication, and was illiterate. Defendant asked the trial judge for "some help" considering that he was facing a life sentence if convicted.

Defendant also said he had told Benz approximately one month prior that he wanted to represent himself. Benz then enumerated the dates he had met with defendant. Benz indicated that, after defendant told him he wanted to represent himself, he sent defendant a letter on December 19, 2006 telling him that he had filed a motion to that effect which the trial judge had approved.[FN5]

> [FN5] It is noted that no written motion requesting that defendant be allowed to represent himself could be found in either this record or the record involving defendant's armed robbery conviction (07-KA-123).

Benz further explained that he told defendant he intended to bring defendant's sister to court to testify, and that if defendant decided he wanted Benz to try the matter, to let him know, and also to let him know if defendant wanted any witnesses subpoenaed. Benz said defendant did not respond to that. Benz further stated that he had filed a motion for discovery, and that discovery was subsequently given to him. He indicated that he filed other motions and expected them to be heard on the day of trial as they usually were. When defendant asked what motions had been filed, Benz told him there was a motion to suppress evidence, confession, and identification, and a motion for criminal history on all state witnesses. Defendant said Benz had not told him about any of those motions.

The trial judge then asked defendant if he wanted Benz to help him or if he wanted to represent himself. Defendant responded that he would rather represent himself. The trial judge stated that

Benz was going to "sit there" anyway and assist him.  Defendant and Benz said, "[a]ll right."  The trial judge also informed defendant that there were rules of evidence that he was not familiar with.  Defendant told the trial judge he respected him, but that he wanted to take his chances and represent himself.

The trial judge responded that he did not think defendant was qualified to represent himself in this case.  He said he was going to allow defendant to represent himself, but he again stated that he was going to ask Benz to assist defendant.  He told defendant that this was a "serious" charge, and only defendant could decide whether he wanted to be tried by the judge or a jury.  Defendant subsequently stated that he wanted a jury trial.  He also stated that he thought the district attorney had to give him the evidence they had against him.  The trial judge said that all the district attorney's office had were police reports and statements, and that the evidence came from witness testimony.

Defendant indicated he could not read, noting that he dropped out of school in the fifth grade, went to "LTI" at 11-years-old, and at one time was in New Orleans General, a mental hospital.  However, defendant said that, while he was imprisoned, people had read the witnesses' statements to him.  The record indicates that defendant and Benz talked, after which defendant said the trial judge might as well convict him now because Benz was not defending him.  The trial judge responded that he had known Benz a long time, and that Benz did the best he could for everybody he represented.  After additional discussion, defendant told the trial judge that if the trial judge could give Benz something to work with, he would keep Benz as his attorney.  Benz told defendant that they had already gone over the witnesses' statements.

Benz then told the trial judge that defendant had told him he did not remember anything about the incident.   After more discussion, defendant agreed to go ahead with jury selection.  Before the jury was selected and sworn, Benz told the jury that he would be assisting defendant in trying this matter.  The jury was then selected and sworn and removed from the courtroom.   The suppression hearing was subsequently held, after which the trial judge denied the motion to suppress the line-up and the statement.  Following the trial judge's denial, the trial judge again suggested to defendant that he reconsider and let Benz handle this case.  Defendant responded that he thought it would be better for Benz to handle the case.

A defendant's right to the assistance of counsel is guaranteed by both our state and federal constitutions.  State v. Brooks, 452

So.2d 149, 155 (La. 1984), citing <u>Gideon v. Wainwright</u>, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).  The Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution give a defendant the right to counsel as well as the right to defend himself.  <u>State v. Bruce</u>, 03-918 (La. App. 5 Cir. 12/30/03), 864 So.2d 854, 857.  "A defendant may represent himself only if he makes an unequivocal request to represent himself and knowingly and intelligently waives his right to counsel."  <u>Id.</u>, citing <u>Faretta v. California</u>, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975), and <u>State v. Bridgewater</u>, 00-1529 (La. 1/15/02), 823 So.2d 877, 893, <u>cert. denied</u>, 537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003).

A waiver of counsel, in order that an accused may enter into self-representation, must be clear and unequivocal.  <u>State v. Ormond</u>, 00-1371 (La. App. 5 Cir. 4/24/01), 786 So.2d 187, 191.  Requests which vacillate between self-representation and representation by counsel are equivocal.  <u>State v. Leger</u>, 2005-0011 (La. 7/10/06), 936 So.2d 108, 147, <u>cert. denied</u>, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007).  A defendant who vacillates between self-representation and representation by counsel cannot be said to have waived his right to learned counsel.  <u>State v. Treadway</u>, 97-901 (La. App. 5 Cir. 03/25/98), 710 So.2d 1121, <u>writs denied</u>, 98-1634 (La. 09/25/98), 725 So.2d 490, 00-1197 (La. 1/12/01), 780 So.2d 1067.  Courts must indulge in every reasonable presumption against a waiver of counsel.  <u>Faretta v. California</u>, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

Before accepting a waiver of counsel, the trial court should advise the defendant of the nature of the charges, the penalty range for the charges, and the dangers and disadvantages of self-representation, such as the failure to recognize objections to inadmissible evidence and the inability to adhere to technical rules governing trials.  <u>Bruce</u>, 864 So.2d at 857.  In addition, the court should inquire into the defendant's age, education and mental condition, and should determine according to the totality of circumstances whether the accused understands the significance of the waiver.  <u>Id</u>.

"Whether an accused has knowingly and intelligently waived his right to counsel is a question which depends on the facts and circumstances of each case."  <u>State v. Strain</u>, 585 So.2d 540, 542 (La. 1991), citing <u>Johnson v. Zerbst</u>, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

A criminal defendant does not have the right to act both as "represented and representative" due to the potential for disruption of the trial process. <u>State v. Brown</u>, 03-897 (La. 4/12/05), 907 So.2d 1, 24, citing <u>State v. Bodley</u>, 394 So.2d 584, 593 (La. 1981). However, "hybrid" representation does allow a defendant the right to defend himself as co-counsel while standby counsel explains and enforces the basic courtroom rules, as long as standby counsel participation does not seriously undermine the defendant's appearance as representing himself before the jury. <u>Brown</u>, 907 So.2d at 21-24.

A defendant performs the core functions of an attorney's traditional role when he formulates his own trial strategy, determines his own theory of the defense, chooses the witnesses to subpoena and to call to the stand, formulates the questions to be asked of the witnesses, and performs the opening and closing statements. <u>State v. Dupre</u>, 500 So.2d 873, 877 (La. App. 1 Cir. 1986), <u>writ denied</u>, 505 So.2d 55 (La. 1987). An attorney functions in an advisory capacity when he is not the controlling strategist, but rather helps the defendant with procedural matters and proper courtroom conduct. <u>Id</u>.

When an attorney partially represents a defendant who assumes functions that are at the core of an attorney's traditional role, the defendant must still knowingly and intelligently waive his constitutional right to have his lawyer perform the core functions, in order to show that the defendant appreciates the possible consequences of mishandling the core functions that lawyers are more competent to perform. <u>Dupre</u>, 500 So.2d at 877. "Therefore, when an attorney is appointed as an advisor the accused must knowingly abandon his right to be represented by counsel." <u>Id</u>.

Once the defendant has made a clear request to represent himself, the trial court must determine whether the defendant is competent to waive counsel and is voluntarily exercising informed free will. <u>State v. Santos</u>, 99-1897 (La. 9/15/00), 770 So.2d 319, 321. Only the defendant's competence to waive his right is at issue, not his competence to represent himself. <u>Id</u>.

Because there are no inflexible criteria or a magic-word formula for determining the validity of a defendant's waiver of the right counsel, the inquiry into validity of the waiver must take into account the totality of the circumstances in each case. <u>State v. Stevison</u>, 97-3122 (La. 10/30/98), 721 So.2d 843, 845.

The trial court is given much discretion in determining whether the defendant's waiver was knowing and intelligent. <u>State v. Mendez</u>, 05-173 (La. App. 5 Cir. 1/17/06), 923 So.2d 189, 194.

Since the trial court has had the opportunity to observe the defendant in court appearances and motions, the trial court is familiar with the defendant. <u>Id</u>. An appellate court should not reverse the trial court ruling absent an abuse of its discretion. <u>Id</u>.

In the instant case, we find that defendant knowingly and intelligently waived his right to counsel. The record reflects that the trial judge told defendant he was facing a serious charge, and that defendant knew he was facing a potential life sentence. The record also reflects that the trial judge advised defendant of the disadvantages of self-representation. The trial judge told defendant that he did not think defendant was qualified to represent himself in this case. He informed defendant that there were rules of evidence defendant was not familiar with and questions defendant had to be able to ask the witnesses. The trial judge further informed defendant that he had to be able to select a jury and understand the procedures. The record also indicates that defendant's IDB counsel told defendant that he would have to review witness statements, police reports, crime lab reports, and autopsy reports (which he gave defendant copies of) and be prepared to question individuals in connection with those statements and reports.

Additionally, we note that the trial judge was aware of defendant's education and mental condition when he allowed defendant to represent himself. Although defendant advised the trial judge that he dropped out of school in the fifth grade and could not read, defendant indicated that many people had read the witnesses' statements to him while he was in prison. Defendant also advised the trial judge that he was in a mental hospital at one time. However, the trial judge presided over defendant's prior armed robbery trial and, therefore, he was familiar with defendant and knew that two doctors had found defendant competent to stand trial in that case.

We also find that defendant was not prejudiced by waiving his right to counsel at the suppression hearing, as defendant's IDB counsel assisted defendant at the request of the trial judge. Additionally, the record shows that defendant competently cross-examined the witnesses at the suppression hearing and made pertinent legal arguments in support of his positions after conferring with IDB counsel. The record further shows that IDB counsel made significant arguments on behalf of defendant's positions as well.

During the hearing on the motion to suppress identification, defendant attempted to elicit during his cross-examination of Detective Gorumba that the other men in the photographic lineup did not look like him. Following defendant's cross-examination, IDB

counsel asked the trial judge to wait a minute, after which defendant asked another question of the detective.  As such, we find that IDB counsel actively participated in assisting defendant with the questions.  The record also shows that during the cross-examination of the eyewitness, Robert McCrory, defendant elicited relevant testimony from McCrory that he was a good distance from the lot when he saw defendant shooting the gun.  Following the testimony, the trial judge denied the motion to suppress the "identification lineup."

The State subsequently moved to play the entire audiotape of defendant's statement, including the reference to the armed robbery committed by defendant.   After conferring with IDB counsel, defendant made the appropriate objections as to relevance, lack of notice, and no <u>Prieur</u>[FN6] hearing.[FN7]  After hearing arguments, the trial judge overruled defendant's objection and denied the motion to suppress statement.

[FN6] <u>State v. Prieur</u>, 277 So.2d 126 (La. 1973).

[FN7] See Assignment of Error Number Two for a more detailed discussion of the exchange among the trial judge, defendant, and IDB counsel.

Defendant's IDB counsel then argued that there was evidence that should be suppressed, namely the gun.  The prosecutor remarked that there had already been a suppression hearing during the armed robbery trial regarding the gun, but he would argue the motion again if necessary.  The prosecutor added that if it was admissible at the last trial, it would be admissible at this trial.  The trial judge said that it was not necessary for him to hear the motion again.  Defendant's IDB counsel argued that they were trying a different crime at this time, that the two crimes were separate, and that what was admissible at one trial might not be admissible at this trial.   The prosecutor responded that evidence regarding the recovery of the gun had not changed and, therefore, evidence of such was admissible.   After hearing arguments of counsel, the trial judge overruled the objection.

In light of the foregoing, we find that defendant knowingly and intelligently waived his right to counsel at the suppression hearing.   Therefore, the trial court did not abuse its discretion in

allowing defendant to represent himself at the suppression hearing with assistance of IDB counsel.[13]

This Court must defer to that state court decision rejecting petitioner's claim unless the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  For the following reasons, the Court finds that those conditions are not met here.

A pretrial suppression hearing is a critical stage of a criminal proceeding.  United States v. Hamilton, 391 F.3d 1066, 1070 (9th Cir. 2004); Henderson v. Frank, 155 F.3d 159, 166 (3rd Cir. 1998).  It therefore necessarily follows that a criminal defendant has a right to counsel at such a hearing.  See Iowa v. Tovar, 541 U.S. 77, 87 (2004) ("The Sixth Amendment secures to a defendant who faces incarceration the right to counsel at all 'critical stages' of the criminal process.").  However, it is clear that a defendant may nevertheless choose to forgo such representation, so long as his waiver of his right to counsel is "knowing, voluntary, and intelligent."  Id. at 87-88.  On that point, the Supreme Court explained:

> We have described a waiver of counsel as intelligent when the defendant knows what he is doing and his choice is made with eyes open.  We have not, however, prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel.  The information a defendant must possess in order to make an intelligent election, our decisions indicate, will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding.

---

[13]  LaGarde, 970 So.2d at 1117-22; State Rec., Vol. VI of VII.

Id. at 88 (citation and quotation marks omitted).  Regarding the last of those factors, the Supreme

Court noted:  "Warnings of the pitfalls of proceeding to trial without counsel ... must be rigorously

conveyed. ...  [A]t earlier stages of the criminal process, a less searching or formal colloquy may

suffice."  Id. at 89 (citation, quotation marks, and brackets omitted).

        In the instant case, the transcript reflects that petitioner was aware of the seriousness

of the charge and that he faced a life sentence if convicted.[14]  The transcript also reflects that the

judge knew that petitioner was illiterate, had a limited education, and had a history of mental

problems.[15]  The judge therefore engaged petitioner in an extensive discussion regarding his

invocation of his right of self-representation.  The following exchange is representative of that

discussion:

> THE COURT:
> You have to understand now, Mr. Lagarde, there's certain
> rules of evidence that I'm sure you're not familiar with, there's
> certain questions that you have to be able to ask, and you have to
> select a jury, you have to understand the procedures.
>
> MR. LAGARDE:
> Your Honor, you know, I truly respect you, Your Honor, you
> know, but I feel like my lawyer is playing on my mental state of
> ability, knowing I'm illiterate, and just pullin' every – you know,
> doing what he want to do, to get this over with, and get me off his
> docket, Your Honor.  So I'd rather just take my chances and go on by
> myself.
>
> THE COURT:
> Well, he's still going to sit there and assist you.

---

[14]  State Rec., Vol. II of VII, transcript of January 17, 2007, p. 10.

[15]  State Rec., Vol. II of VII, transcript of January 17, 2007, pp. 10 and 18-19.

MR. LA GARDE:
     All right then.

MR. BENZ [defense counsel]:
     All right.

THE COURT:
     And I think – personally, I don't think your qualified to represent yourself in this case, Mr. Lagarde.  All right?

MR. LAGARDE:
     I state all that for the record, Your Honor.[16]

Accordingly, although the judge was aware of petitioner's limitations and attempted to dissuade him from representing himself, the judge finally acknowledged that it was petitioner's right to make such a decision and reluctantly granted the request.  Despite the judge's obvious concerns, he was correct in finding that petitioner's right of self-representation was not defeated by his lack of legal expertise.  As the Supreme Court has explained:

> [T]he defendant's technical legal knowledge is not relevant to the determination whether he is competent to waive his right to counsel, and ... although the defendant may conduct his own defense ultimately to his own detriment, his choice must be honored.  Thus, while it is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts, a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation.

Godinez v. Moran, 509 U.S. 389, 400 (1993) (citations, quotation marks, and brackets omitted).[17]

---

[16]  State Rec., Vol. II of VII, transcript of January 17, 2007, pp. 15-16.

[17]  It is unclear whether petitioner is also claiming that he was not in fact mentally competent to choose self-representation.  If he is asserting such a claim, it likewise has no merit.  Petitioner was found mentally competent to stand trial.  State Rec., Vol. I of VII, transcript of March 16, 2005.  The competency standard for waiving the right to counsel is no higher than the competency standard for standing trial.  Godinez, 509 U.S. at 391.  Moreover, petitioner has offered no evidence whatsoever to indicate that he was mentally incompetent.  Therefore, he clearly has not met his burden of proof with respect to such a claim.

In light of the foregoing, this Court finds that the state court decision rejecting petitioner's claim was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Accordingly, under the deferential standards imposed by the AEDPA, this Court should likewise reject the claim.

## B.  Evidentiary Claim

Petitioner next claims that his rights were violated by the admission of evidence concerning another crime.  On direct appeal, the Louisiana Fifth Circuit Court of Appeal rejected that claim, holding:

> [D]efendant argues that the trial court erred by admitting into evidence his audiotaped statement which included reference to the armed robbery for which he was previously convicted.  He contends that the trial court permitted the evidence to be heard by the jury without requiring the state to comply with notice requirements, and without requiring the state to show some independent probative value for the evidence.  Defendant asserts that the trial court's error in admitting the evidence was not harmless on the basis that it was cumulative, as he would not have testified had the trial court allowed him a continuance to secure the presence of a witness.
>
> The State responds that the evidence was admissible without prior notice to the defense because it constituted an integral part of the crime, and because it explained the sequence of events leading to defendant's arrest.  The State further responds that the evidence was cumulative.  After the trial judge denied defendant's motion to suppress identification, the State noted that it intended to play the entire audiotape of defendant's statement without redacting anything, including the references to the armed robbery defendant committed and for which he was convicted prior to the instant trial.  The State indicated that there was no surprise as to the contents of that tape, and that both crimes occurred within a short period of time of one another.  The State further indicated that it was going to introduce the clothes and the gun recovered from the stolen vehicle.

Defendant's IDB counsel asked the trial judge to allow him to explain to defendant what was happening.  After he did so, defendant objected.  The trial judge responded that they had already had a trial, which would be similar to a <u>Prieur</u> hearing.  He said that he was going to go ahead and allow the tape to be played considering the close space in time between the two crimes, and because the evidence would have been allowed had there been a <u>Prieur</u> hearing.  Defendant countered that the armed robbery was a separate crime, that the State did not give him notice they were going to admit evidence of that crime, and that no <u>Prieur</u> hearing had been held.

The trial judge informed defendant that he already had notice because he had been convicted of the armed robbery.  Defendant said he did not see the relevance, again arguing that these were two separate incidents occurring in separate places.  The trial judge overruled his objection and allowed the statement to be played in its entirety.  Defendant noted his objection.  The trial judge then denied the motion to suppress statement.

Evidence of other crimes, wrongs or acts may be introduced when it is independently relevant or when it relates to conduct, formerly referred to as *res gestae*, that "constitutes an integral part of the act or transaction that is the subject of the present proceeding." LSA-C.E. art. 404(B)(1).  A close connexity between the charged and uncharged conduct is required to ensure that "'the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.'" <u>State v. Noten</u>, 01-1818 (La. 6/25/01), 791 So.2d 607, 609 (*per curiam*), internal citations omitted.   Evidence that constitutes an integral part of the crime is admissible without prior notice to the defense.  <u>State v. Charles</u>, 00-1586 (La. App. 5 Cir. 6/27/01), 790 So.2d 705, 708.

The test for integral act (*res gestae*) evidence is therefore not simply whether the state might somehow structure its case to avoid any mention of the uncharged act or conduct, but whether doing so would deprive the state's case of narrative momentum and cohesiveness, "'with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.'"  <u>State v. Colomb</u>, 98-2813 (La. 10/1/99), 747 So.2d 1074, 1076, quoting <u>Old Chief v. United States</u>, 519 U.S. 172, 186, 117 S.Ct. 644, 653, 136 L.Ed.2d 574 (1997).  <u>Accord</u>, <u>State v. Taylor</u>, 01-1638 (La. [2003]), 838

So.2d 729, 741-742, <u>cert. denied</u>, 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004).

In a similar case, <u>State v. Edwards</u>, 406 So.2d 1331, 1350-1351 (La. 1981), <u>cert. denied</u>, 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982), defendant, who was convicted of first degree murder, argued that the trial judge improperly admitted evidence of other crimes attributable to him.  In that case, the testimony indicated that defendant and another accomplice arrived at a third person's house, and that defendant suggested they "go make a hit."  They first went to a grocery store where defendant stole some wine, and then they ultimately went to the victim's house, killed her, and sped away from the scene in the victim's automobile.  The testimony also indicated that they subsequently followed another woman to a college campus in an attempt to snatch her purse but abandoned the plan when she saw them coming.  Afterwards, they went to a convenience store looking for still another "hustle" until the appearance of a police officer terminated the night's activities.  The Louisiana Supreme Court found that the other crimes evidence was properly admitted under the *res gestae* exception, noting that the sequence of events formed "one continuous transaction" with the crime for which defendant was being tried.  <u>Id</u>. at 1351.

In the instant case, we find that the armed robbery incident was admissible without prior notice because it constituted an integral part of the crime that is the subject of the present proceeding.  The record indicates that there was a close temporal connection between the two incidents.  Defendant shot the victim, went to a "crack house" to smoke crack cocaine, then stole a woman's vehicle to escape the area when he heard that people were saying that he had killed the victim.  Additionally, the weapon used in the shooting was recovered from the stolen vehicle.  Further, the evidence was cumulative, as defendant testified that he was serving a 99-year sentence for the armed robbery incident.

However, even if the trial court erred in allowing evidence of the armed robbery, the introduction of inadmissible other crimes evidence is subject to a harmless error analysis.  <u>State v. Johnson</u>, 94-1379 (La. 11/27/95), 664 So.2d 94, 102; <u>State v. Washington</u>, 03-1135 (La. App. 5 Cir. 1/27/04), 866 So.2d 973, 980.  An error is harmless when the verdict is "surely unattributable to the error." <u>State v. Johnson</u>, *supra*, at 102.

We conclude that the verdict was "surely unattributable to the error," as there was ample other evidence to convict defendant of second degree murder.  Robert McCrory testified that he observed

defendant shooting a gun into the ground, but that he could not see what defendant was shooting at because the weeds were too high. Afterwards, McCrory saw defendant turn around to see if anybody was looking, then put on a mask and run away. When McCrory went outside, he saw a man lying on the ground. Defendant admitted at trial that he and the victim got into an argument, and that he shot a gun into the ground. Defendant also testified that he did not remember whether he killed the victim. Additionally, one of the guns used in the shooting was recovered from the vehicle defendant stole to escape the area after the shooting.

In light of the foregoing, we find that the trial court did not err by admitting the entire audiotaped statement of defendant into evidence. This assignment is without merit.[18]

The United States Fifth Circuit Court of Appeals has held: "In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law." Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998). Therefore, to the extent that petitioner is arguing that the state courts misapplied state evidence law, his claim is not reviewable in this federal proceeding.[19]

To the extent that petitioner is in fact asserting a federal claim, he fares no better. Even where evidence was in fact improperly admitted, federal *habeas* relief is not necessarily warranted. The United States Fifth Circuit Court of Appeals has explained:

We will not grant habeas relief for errors in a trial court's evidentiary rulings unless those errors result in a "denial of fundamental fairness" under the Due Process Clause. The erroneous admission of

---

[18] LaGarde, 970 So.2d at 1122-24; State Rec., Vol. VI of VII.

[19] Nevertheless, this Court notes that, as the state courts clearly held, the challenged evidence was in fact properly admitted. Evidence, such as that at issue here, which is necessary to explain the sequence of events to the jury is relevant and admissible under the *res gestae* doctrine. See, e.g., State v. Senegal, 19 So.3d 623, 627 (La. App. 3rd Cir. 2009); State v. Clements, 519 So.2d 236, 238 (La. App. 5th Cir. 1988); State v. Johnson, 440 So.2d 838, 842 (La. App. 2nd Cir. 1983).

> prejudicial evidence will justify habeas relief only if the admission
> was a crucial, highly significant factor in the defendant's conviction.

Neal v. Cain, 141 F.3d 207, 214 (5th Cir. 1998) (citations omitted); see also Little v. Johnson, 162

F.3d 855, 862 (5th Cir. 1998) ("[O]nly when the wrongfully admitted evidence has played a crucial,

critical, and highly significant role in the trial will habeas relief be warranted.").

Therefore, even if the challenged evidence had been wrongfully admitted into

evidence, *which it was not*, it nevertheless cannot be said that the evidence played a crucial, critical,

and highly significant role in petitioner's conviction in light of the other overwhelming evidence of

guilt noted by the state court.  Accordingly, he simply cannot demonstrate that the admission of the

challenged evidence resulted in a denial of fundamental fairness.

In summary, petitioner has failed to demonstrate that the state court's decision was

contrary to, or involved an unreasonable application of, clearly established federal law, as

determined by the Supreme Court of the United States.  Accordingly, applying the AEDPA's

deferential standard, this Court should likewise reject his evidentiary claim.

### C.  Denial of Continuance

Lastly, petitioner claims that his rights were violated by the trial court's denial of his

oral motion for a continuance.  On direct appeal, the Louisiana Fifth Circuit Court of Appeal

rejected that claim, holding:

> Defendant next argues that the trial court erred by denying his
> oral motion for a continuance to secure the presence of a material
> witness.[FN8]  He contends that the trial court's ruling forced him to
> testify on his own behalf, a strategy he would not have otherwise
> chosen.  The State responds that the trial court did not abuse its
> discretion in denying the motion, noting that defendant did not satisfy
> the criteria set forth in LSA-C.Cr.P. art. 709.

[FN8] It is noted that defendant's motion for a continuance should have been styled "motion for recess" since trial had already begun.  See LSA-C.Cr.P. art. 708, *infra*.  It is also noted that defendant in his brief cites to Louisiana Code of Civil Procedure articles 1601 and 1602 to support his contention that the continuance should have been granted.  However, those articles and the case law cited along with those articles involve civil cases, not criminal, and, therefore, are inapplicable to the instant case.

On January 17, 2007, after the State rested its case, defense counsel informed the trial judge that his witness, defendant's sister, would not be available until the next day.  He also informed the trial judge that he wanted to keep Det. Gorumba on call.  The trial judge asked defense counsel what time his witnesses would be there, and defense counsel responded that if they were going to come, they would be there for 9:00 or 9:30 a.m.

Defense counsel indicated that defendant's sister was coming by train from the west coast, and that she had left on Sunday.  The trial judge noted that that trip would take three days.  Defense counsel responded that she should be there today, that she was supposed to call when she got in, but that he had not heard from her.  An unrecorded off-the-record bench conference was held, after which the trial judge informed the jury that they would have to return the next day to hear testimony from two additional witnesses.  The minute entry indicates that court was adjourned at approximately 4:30 p.m.

On January 18, 2007, at approximately 10:00 a.m., the second day of trial, a bench conference was held.  Defense counsel asked that the trial be continued until that afternoon, as defendant's sister was somewhere between Gretna and Chicago on a train.  Defense counsel explained that the witness had no control over when she got there since she was coming by train.  When the trial judge asked defense counsel whether he had any other witnesses, defense counsel responded negatively, remarking that defendant was going to have to testify since his sister was not there.

The trial judge inquired as to whether defendant's sister was a fact witness, and defense counsel stated that she was going to testify as to defendant's drug problem.  The trial judge said that if

– 23 –

defendant was going to testify, that he could cover that area.  Defense counsel explained that if defendant's sister was there, defendant might not have to take the stand.  He noted that he had heard from defendant's sister yesterday, that she was in Chicago at that time, and that she was supposed to have gotten into town at approximately 4:00 or 5:00 a.m.  The trial judge denied defense counsel's motion, saying that defendant's sister would have had "plenty enough time" to get there if she were coming.  Defense counsel noted his objection.

Both the Sixth Amendment of the United States Constitution and Article I, Section 16 of the Louisiana Constitution (1974) guarantee a criminal defendant the right to compulsory process and to present a defense.  A defendant's right to compulsory process is the right to demand subpoenas for witnesses and the right to have those subpoenas served.  State v. Gordon, 01-734 (La. App. 5 Cir. 11/27/01), 803 So.2d 131, 148, writs denied, 2002-0362 (La. 12/19/02), 833 So.2d 336 and 2002-0209 (La. 2/14/03), 836 So.2d 134.

LSA-C.Cr.P. art. 708 defines continuance and recess as follows:

> A continuance is the postponement of a scheduled trial or hearing, and shall not be granted after the trial or hearing has commenced.  A recess is a temporary adjournment of a trial or hearing that occurs after a trial or hearing has commenced.

Pursuant to LSA-C.Cr.P. art. 709, a defendant must state the following in order to be entitled to a continuance for securing the presence of a witness:

> (1) Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial;

> (2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred; and

> (3) Facts showing due diligence used in an effort to procure attendance of the witness.

– 24 –

A motion for recess is evaluated by the same standards as a motion for a continuance.  State v. Warren, 437 So.2d 836, 838 (La. 1983); State v. Rodriguez, 02-334 (La. App. 5 Cir. 1/14/03), 839 So.2d 106, writ denied, 03-0482 (La. 5/30/03), 845 So.2d 1061.  The decision to grant a recess lies within the discretion of the trial court and will not be overturned absent an abuse of that discretion.  State v. Hampton, 98-0331 (La. 4/23/99), 750 So.2d 867, 877, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999); State v. Stevenson, 02-0079 (La. App. 5 Cir. 4/30/02), 817 So.2d 343, 345.

In the instant case, it is initially noted that the trial judge did, in fact, adjourn the proceedings after defense counsel said that his witness would not be available until the next day, if she was going to come.  Thus, defense counsel was given additional time to locate his witness and bring her to court.  Apparently, defendant is arguing in his brief that the trial judge erred by denying his request for a recess when his witness failed to appear the next day.

The record shows that defendant did not satisfy the requirements of LSA-C.Cr.P. art. 709.  Although defense counsel informed the trial judge that defendant's sister was going to testify as to defendant's drug problem, the trial judge apparently thought that such testimony was either not material or unnecessary.  As the State noted in its brief, there is no evidence such testimony would have been relevant or permitted.  Defendant also failed to state facts and circumstances showing a probability that the witness would be available at the time to which the trial was deferred.  The witness allegedly left the west coast on Sunday, January 14th and still had not arrived in court by the morning of Thursday, January 18th.  As the trial court correctly noted, the witness had enough time to come to court had she so desired.  Additionally, we find that defendant failed to use due diligence in an effort to procure the attendance of the witness, as there was no evidence presented at trial that defense counsel attempted to subpoena the witness.

Finally, defendant has failed to show that he was prejudiced by the failure of the witness to testify.  The witness's testimony was not relevant to defendant's guilt or innocence, and the record reflects that defendant testified regarding his drug problem.  Also, there is no evidence that defendant would not have testified had his sister done so.

In light of the foregoing, we find that the trial court did not abuse its discretion in denying defendant's motion for a recess to secure the presence of a witness.[20]

The United States Fifth Circuit Court of Appeals has held:  "When a denial of a continuance is the basis for a habeas petition, the petitioner must show an abuse of discretion that was so arbitrary and fundamentally unfair as to violate the constitutional principles of due process." Newton v. Dretke, 371 F.3d 250, 255 (5th Cir. 2004) (citations omitted).  Moreover, "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."  Ungar v. Sarafite, 376 U.S. 575, 589 (1964).  Further, an abuse of discretion is not alone sufficient to warrant relief; in addition, petitioner must also show resulting prejudice:

> If abuse of discretion is demonstrated, the petitioner must sustain the burden common to due process claims that there is a reasonable probability that the verdict might have been different had the trial been properly conducted; as applied to the alleged failing, that there is a reasonable probability that the granting of a continuance would have permitted him to adduce evidence that would have altered the verdict.

Schrader v. Whitley, 904 F.2d 282, 288 (5th Cir. 1990) (footnotes and internal quotation marks omitted).

---

[20] LaGarde, 970 So.2d at 1124-26; State Rec., Vol. VI of VII.

Even if petitioner could establish an abuse of discretion, which is doubtful at best,[21] he clearly cannot show resulting prejudice.  There is simply no reasonable probability that the verdict here would have been different had the trial been delayed so that petitioner's sister could testify.  She had no information whatsoever to convey concerning the commission of this crime.  She was being called as a witness solely to testify that petitioner was a drug addict;[22] however, there is no indication that the sister had any knowledge of whether petitioner was on drugs at the time of this murder.  Therefore, her testimony would have had little, if any, relevance, and no bearing on petitioner's guilt or innocence of this particular crime.  Moreover, in any event, petitioner testified at length regarding his drug problems.  For example, he testified as follows:

> Q.     Okay.  Do you have a cocaine and heroin habit?
>
> A.     Yeah.
>
> Q.     Tell me about it, what – what – what kind of a habit do you have?
>
> A.     You know, I just, you know, I like heroin, I loves the heroin, and I love the crack, and that was – you know, when I couldn't have the heroin, I'd shoot the crack, and when I couldn't have the crack, I was just, you know, going to get the heroin.
>
> Q.     How long have you had this habit?

---

[21]   The trial date in this matter was set long in advance.  State Rec., Vol. II of VII, minute entry dated November 27, 2006.  Accordingly, petitioner's counsel could have made the necessary arrangements to secure the sister's timely appearance if he was so inclined.  Moreover, there has been no evidence presented to corroborate the assertion that the sister was in fact on her way to Louisiana or to establish when she was scheduled to arrive.

[22]   State Rec., Vol. II of VII, transcript of January 18, 2007, p. 6.

A.      Since I first experiment when I come home from the LCI, and that was in 2000.

Q.      So you've had this crack habit, heroin habit since 2000?

A.      Uh huh.

Q.      How much do you use a day, do you know?

A.      Well I can estimate and tell you, I'd say, Two, Two or Three Thousand Dollars a day, cause the bags itself, the heroin itself is Twenty-Five Dollars just for a little bundle, you know, a little bitty – a little bitty like ash, like you smokin' a cigarette, you just drop a little ash right there, you pay Twenty-Five Dollars for that little bit right there.

Q.      Uh huh.

A.      And –

Q.      That's heroin?

A.      That's heroin.

Q.      Now, what about the crack?

A.      Crack, about a Hundred, Two Hundred Dollars, Three Hundred Dollars a day, you know, most likely.  I got a lot of partners there, you know, give me crack, you know.  Then I got some friends, you know, that, you know, sell a lot of crack, so, they just like, give it to me, you know, a favor for a favor, you know.[23]

The jury was obviously unmoved by this testimony and the fact of petitioner's addiction, and there is simply no reason to believe that the sister's testimony on this same issue would have been any more persuasive to them or had any effect whatsoever on their verdict.

_____

[23] State Rec., Vol. II of VII, transcript of January 18, 2007, pp. 13-14.

In light of the foregoing, this Court finds that the state court decision rejecting petitioner's claim was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Accordingly, under the deferential standards imposed by the AEDPA, this Court should likewise reject the claim.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that petitioner's application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[24]

New Orleans, Louisiana, this twenty-second day of November, 2010.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[24] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.